**UNITED STATES of America,**

v.

**Nat SCHLESINGER, also known as "Naftule Schlesinger" and "Zvi Pollack," Herman Niederman, and Goodmark Industries, Inc., Defendants.**

**No. CR.02–485(ADS)(ARL).**

United States District Court,
E.D. New York.

July 17, 2006.

---

Roslynn R. Mauskopf, United States Attorney, by Lawrence Philip Ferazani, Cynthia M. Monaco Central Islip, NY, Richard Lunger, Assistant U.S. Attorneys, for United States of America.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York, NY (Herald Price Fahringer, of Counsel), Jeremy L Gutman, New York, NY, for the defendants Nat Schlesinger and Goodmark Industries, Inc.

Michael L. Soshnick, Esq., Adrian L. Diluzio, Esq., Mineola, NY, for the defendant Nat Schlesinger.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In this motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P.") the defendant Nat Schlesinger ("the defendant") seeks a new trial on his conviction following a trial by a jury, of thirty various counts of arson, conspiracy, insurance fraud, creditor fraud, and money laundering, on the basis of newly discovered evidence. The motion calls into question the veracity of two witnesses, primarily with the use of a surreptitiously recorded witness recantation. In addition, the defendant also alleges that the government not only withheld information useful for impeachment, but knowingly permitted false testimony concerning such information. Although the testimony at issue, and all of the alleged newly discovered evidence, relate only to the arson counts, the defendant seeks dismissal of the entire conviction on the theories of prosecutorial misconduct and prejudicial spillover. The Court begins with a table of contents.

## CONTENTS

I. BACKGROUND .................................................................. 81
 A. The Indictment ........................................................... 81
 B. The Trial ................................................................ 81
 1. The Fraudulent Scheme ............................................. 81
 2. The Arson ......................................................... 82
 i. Testimony of the Firefighters ................................. 82
 ii. Testimony of Thomas J. Russo and James Pryor ................... 83
 iii. Testimony of David Steinberg ................................. 84
 iv. Testimony of Fire Marshal Bernard Santangelo .................. 84
 v. Testimony of Abraham Weiser ................................... 85
 vi. Testimony of Victor Schlesinger .............................. 85
 vii. Testimony of Israel Schwimmer ............................... 86
 viii. Additional Evidence of Arson .............................. 87
 3. The Defense ....................................................... 87
 4. Verdict ........................................................... 88
 C. The Post Trial Motions .................................................. 88
 1. The Rule 29 Motion for a Judgment of Acquittal .................... 88
 2. The First Rule 33 Motion for a New Trial ......................... 89
 3. The Second Rule 33 Motion for a New Trial ........................ 89
 i. The Alleged Newly Discovered Evidence ........................ 90
 (a) Israel Schwimmer's Recantation ........................... 90
 (b) Signed Statement of David Ganz .......................... 91
 (c) Ruling by Rabbi Gruber on behalf of the Rabbinical Court
 (Beis Din Tzedek) ...................................... 92
 (d) Affidavits from Certain Members of Israel Schwimmer's
 Family ................................................. 92
 (e) Signed Statements of Members of the Community
 Regarding Victor Schlesinger's Testimony ............... 93
 (f) Affidavit of Private Investigator Warren Flagg ........... 94
 (g) Additional Evidence of the Minnesota Investigation ....... 94
 ii. The Government's Response ................................... 94
 D. Post Trial Evidentiary Hearing .......................................... 95
 1. Testimony of Israel Schwimmer ..................................... 96
 2. Testimony of Abraham Lichtenstein ................................. 98
 3. Testimony of Susan Necheles, Esq. ................................. 98

 4. Testimony of Doran Zanani, Esq. ...................................99
 5. Testimony of Government Agents in the Minnesota Investigation ..........99

II. DISCUSSION .........................................................100
 A. The Legal Standard in a Motion for a New Trial ..........................100
 B. As to Israel Schwimmer's Recantation ...................................101
 1. The Scope and Materiality of the False Testimony ......................101
 2. The Repudiation of the Recantation ..................................102
 3. As to the Alleged Falsity of the Schwimmer Trial Testimony.............103
 C. As to the Alleged Perjury of Trial Witnesses .............................106
 D. As to the Government's Alleged Failure to Disclosure Impeachment
 Evidence ................................................................110

III. CONCLUSION ........................................................111

## I. BACKGROUND

### A. The Indictment

On October 1, 2003, a grand jury entered a 34 count Superseding Indictment ("Indictment") against defendants Nat Schlesinger, Herman Niederman, and Goodmark Industries, Inc., charging arson, conspiracy, insurance fraud, creditor fraud, and money laundering, arising out of, among other acts, a series of five fires dating back to 1987 that occurred at a clothing factory in the Williamsburg section of Brooklyn. The Indictment alleged that Nat Schlesinger owned and maintained the factory with his brother, Jack Schlesinger, in a building that had various addresses due to the fact that the building occupied an entire city block and had multiple entrances.

The Indictment alleged that Nat Schlesinger and his brother masked their ownership of the numerous clothing manufacturing companies that occupied this location from the time they purchased the building in the early 1980's in order to conceal certain fraudulent schemes. One scheme involved defrauding insurance companies by submitting fraudulent claims for losses resulting from a series of five separate fires that occurred at the Premises from 1987 to 1999. The second scheme involved using various companies as vehicles to defraud creditors.

The Indictment also charged Nat Schlesinger with one count of arson and one count of use of fire to commit a felony in connection with the fire that occurred at the factory on December 31, 1998. The indictment charged that Nat Schlesinger deliberately caused a fire in the factory on the night of December 31, 1998 for the purpose of submitting a false and inflated insurance claim totaling approximately $4,590,000.

### B. The Trial

On April 11, 2005, a jury trial was commenced on the charges in the indictment.

#### 1. The Fraudulent Schemes

At the trial the government offered overwhelming evidence of the two fraudulent schemes alleged in the indictment. In connection with the scheme to fraudulently inflate insurance claims on the five fires that occurred at the factory, through witnesses and numerous documents, the government showed that the defendant, through his various clothing businesses, unlawfully obtained money in the sum of $4,510,629.41 from insurance companies by bribing employees and adjusters, and submitting false documentation in support of fraudulent insurance claims. This amount was received by the defendant's businesses from insurance companies in payment of fraudulently inflated claims for the fires

that occurred at the clothing factory. In addition, the government also established that this same sum of $4,510,629.41 in fraudulent insurance payments was laundered when it was deposited into and transferred through the various business accounts of the defendant and his businesses.

The government also submitted ample evidence proving the second complex creditor fraud scheme. This scheme involved the use of the defendant's companies Pous Apparel, Inc., Private Brands, Inc., and Goodmark Industries, Inc., as vehicles to defraud various creditors by masking the true ownership of the companies. This was accomplished by the use of nominees and shell corporations, and ultimately succeeded in carrying out what was, in effect, two self organized bankruptcies. Specifically, one of the fraudulent acts that the government proved at the trial was that Nat Schlesinger foreclosed on Goodmark Industries' machinery and equipment by using a company he controlled known as Western Industries, Inc., leaving the creditors of Goodmark without any recourse against Goodmark's assets. The evidence also showed that Nat Schlesinger masked his ownership of Western Industries through a series of nominees and transactions with shell corporations. After foreclosing on the Goodmark assets, Western Industries then sold the equipment at auction for the sum of $72,525.

## 2. The Arson

In comparison to the overwhelming direct evidence offered with regard to the two fraudulent schemes, the government's case on the arson counts consisted of circumstantial evidence. The government called several witnesses to testify about the fire including: (1) firefighters who were at the scene; (2) a cause and origin expert; (3) an electrical engineer who ex-amined the wiring at the fire scene; (4) a sewing machine repairman; (5) the New York City Fire Marshal who investigated the fire; (6) the manager of the third floor of the factory where the fire occurred; and (7) two employees who were at the factory and overheard conversations that the defendant had before and after the fire. These last two witnesses are the subject of the defendant's current motion for a new trial.

### i. Testimony of the Firefighters

Peter Casey, a retired New York City Fire captain, and Kevin Williams, a retired New York City Fire lieutenant, both testified that on December 31, 1998, they were assigned to Ladder Company 104 in the Williamsburg section of Brooklyn. While on duty that night, at about 10:30 p.m., the New York City Fire Department received reports of a fire at the clothing factory in Williamsburg. Several fire companies, including Ladder 104, were dispatched and confirmed that there was visible fire coming from the third floor of the factory. All of the entrances to the factory were locked and secure when the fire department arrived. The firefighters forced entry into the factory and ascended the stairs to the third floor. At the top of the stairs they found that the entrance to the third floor was also locked and they had to break down that door. Inside the third floor there was a smokey fire that was difficult to find. One of the firefighters became lost while searching for the fire and sent out a "mayday." The firefighter was quickly rescued and was unharmed.

The fire was eventually found to be located underneath a mezzanine that was constructed above the third floor. Under the mezzanine, clothes were hung from rows of racks. Above the mezzanine boxed goods were stored. Firefighters testified that in order to extinguish the fire

they had to proceed through each of the rows of clothes under the mezzanine. Part of the mezzanine eventually collapsed due to the fire.

### ii. Testimony of Thomas J. Russo and James Pryor

The primary investigation with regard to the December 31, 1998 fire was conducted by Thomas J. Russo of Russo Consultants, a cause and origin expert hired by Atlantic Mutual Insurance Co. ("Atlantic Mutual"). This company was retained to investigate and ascertain the origin and cause of the fire that occurred at the defendant's factory on December 31, 1998. Russo had 24 years of prior experience both as a New York City Firefighter and Fire Marshal. On January 7, 1999, Russo first went to the scene of the fire at the factory to investigate, at which time he conducted a physical inspection of the premises. Russo determined that the origin of the fire was in the shipping area on the third floor.

Russo then investigated the cause of the fire. The on site inspection revealed that there were no appliances, candles, machinery, chemicals, smoking material, or heating units in the area of origin. He also determined that the entire building was secured when the fire department arrived in that all of the locks on the entrances to the factory were forced open by the fire department, and by reviewing the reports of the fire department indicating the use of force to gain entry to the building.

In order to assist his investigation, Russo hired James Pryor, an electrical engineer, to review the electrical system in the area of origin. The electrical engineer testified that he determined that there were no electrical faults which could have caused the fire. Pryor testified that he inspected the circuit breaker panel which provided service to the area of the fire, as well as the wiring and lighting in the area of the fire. Pryor ruled out electrical causes for this fire.

Russo also conducted witness interviews of Abraham Weiser and Jack Schlesinger. Weiser told him that he personally did not smoke and he did not observe anyone smoking on the third floor on December 31, 1998. He stated there were no candles, incense, oily rags, or cleaning agents in the area. Weiser stated that he did not notice anything unusual prior to departing and securing the area. Jack Schlesinger told Russo that a delivery man may have been on the third floor around 11:00 a.m. on December 31, 1998. He also stated that he, his brother Nat Schlesinger, and one other person were the only people with keys to the entire building.

As a result of his investigation, Russo concluded that the fire was intentionally set. Russo arrived at this conclusion by excluding all electrical and accidental causes. He was able to exclude cigarette smoking as a possible source of ignition for the following reasons: (1) there was no evidence that personnel smoked on the third floor; (2) there was no evidence of cigarettes on the third floor; and (3) the time between the last person exiting the building and the report of the fire was too long to support the inference that a kindling cigarette could have started the fire. Russo also excluded an act of God after research indicated that there were no earthquakes or thunderstorms. Russo further excluded the possibility that the roof mounted heater caused the fire upon examination of the unit, which showed no evidence of flame impingement or any other heat source coming from the unit. After excluding all accidental causes, Russo concluded that the December 31, 1998 fire was intentionally set.

### iii. Testimony of David Steinberg

Testimony and other evidence was offered by the government to show that not only did Atlantic Mutual's investigation label the fire as intentionally set, but that the insurance claim the defendant submitted to Atlantic Mutual with regard to the 1998 fire was fraudulent. David Steinberg, a self-employed sewing machine repairman, testified under a grant of immunity that in January 1999 he assessed the damage to the machines at the factory. Steinberg stated that he either merely applied a coat of oil to the machines or advised Schlesinger to do the same. For these services, Steinberg faxed an estimate to the defendant for $58,000. After the first estimate, the defendant or his brother called Steinberg and asked for a second estimate. The second estimate was for $85,860. Steinberg then sent an invoice for $85,860 for the repair of the machines, even though he never did the work on the machines. Gov't Ex. 98–43. Steinberg testified that he lied to insurance company employees and claimed to have performed the work reflected on the invoice, even though he never did any work. Trial Tr. at 1225.

In addition, the insurance claim that the defendant submitted contained a fraudulent estimate from a company known as G.I.I. Engineering. This was a fictitious company created by the defendant for the purpose of submitting a fraudulent insurance claim.

### iv. Testimony of Fire Marshal Bernard Santangelo

New York City Fire Marshal Bernard Santangelo testified that he opened an investigation regarding the fire in March 1999, approximately three months after it occurred. The New York City Fire Marshal was initially requested to investigate the suspicious fire the night of the fire, but

was unable to respond until the following Monday due to the New Year's holiday. When the Fire Marshal responded, a quick investigation was conducted and it was determined that the cause of the fire was "not ascertained." Due to lack of resources, the investigator at the time was unable to search under the partially collapsed mezzanine, and thus labeled the location of the fire as the third floor, origin unknown. Fire Marshal Santangelo reopened the investigation several months later when he was contacted by Charles Radtke from Russo Consultants with regard to the suspicious fire.

After commencing the investigation, Fire Marshal Santangelo requested documents from the insurance company regarding its investigation and he attempted to interview both Jack Schlesinger and Nat Schlesinger. He testified that the defendant repeatedly changed the date of the interview and delayed his appointment on several occasions. When the defendant finally met with Fire Marshal Santangelo, the defendant tape recorded the meeting without Fire Marshal Santangelo's knowledge. In the interview, Nat Schlesinger told Fire Marshal Santangelo that he was the "Manager of financial operations" and held no official position in the company or on the board of directors. The defendant also refused to answer several questions and seemed irritated. Also, the defendant responded to several questions by asking questions such as "who are you?" The defendant told Fire Marshal Santangelo that he had a complete set of keys to the building and left the building around 6 or 7 p.m. the night of the fire. When asked about the claim history of the building, the defendant stated that he could only recall one other fire which occurred in 1991 when the factory was operating as Private Brands. The defendant also denied any involvement in Private Brands.

Fire Marshal Santangelo's investigation also considered the insurance claim submitted by Goodmark Industries. He determined that the defendant submitted a fraudulent estimate of repair to the machinery. The estimate was drafted by a company he later found to be fictitious named G.I.I. Engineering. In his report, he also included the Russo report and the report from James Pryor the electrical expert. Fire Marshal Santangelo interviewed the firefighters that responded to the scene as well as witnesses who were at the Defendant's building, including Abraham Weiser, Victor Schlesinger, and Israel Schwimmer.

Fire Marshal Santangelo also testified that on August 3, 1999, another fire broke out at the building. This fire was also later determined to be intentionally set because it had four distinct and separate points of origin.

Based upon all the interviews, reports, photographs, and his investigation, Fire Marshal Santangelo concluded that the 1998 fire was an arson and that it was ignited by the intentional application of an open flame. Fire Marshal Santangelo also concluded that the only persons who had keys to the entire building on that night were Jack and Nat·Schlesinger and that the buildings were secure upon arrival of the fire department.

### v. Testimony of Abraham Weiser

Abraham Weiser was called as a witness by the government. He had worked for the Defendant for approximately twelve years until the clothing business closed in 2000. At the time of the fire, Abraham Weiser was the supervisor of the shipping department located on the third floor. He was responsible for packing the manufactured garments in boxes to ship by UPS or in bags to be delivered by their own truck. Weiser testified that no other employees worked with him in the shipping area in December 1998. One of his responsibilities was to secure the two entrances to the third-floor shipping area and turn off the lights by closing the circuit breaker each night before he left. In fact, Abraham Weiser testified that it was his practice to secure both doors and turn off the circuit breaker at the end of the day and that the only other people with keys to that floor were Jack and Nat Schlesinger. However, Abraham Weiser stated that he did not have keys to the exterior entrances of the factory.

Weiser testified that on December 31, 1998, he was the only person on the third floor during the day. He testified that he did not smoke; that smoking was not permitted in the building; and he did not observe anyone smoking on the third floor on the day of the fire. Weiser stated that he "wouldn't let them smoke" because he "can't take the smoke." Trial Tr. at 616. Weiser further testified that there were no flammable liquids, thinners, dyes, linseed oils or the smell of smoke or any other unusual odor before he left on December 31, 1998. Weiser stated that occasionally a small cleaning gun was used on the third floor to remove stains from the finished garments. Weiser testified that on December 31, 1998, at about 4:00 p.m., he locked up the third floor and turned off the circuit breaker providing electricity to the third floor, locked both doors, and left the building.

### vi. Testimony of Victor Schlesinger

Victor Schlesinger, who is Jack Schlesinger's son, testified that at the time of the fire he had maintained an office in the factory on the second floor. Victor stated that he would typically visit the factory and his father Jack daily at the end of the day. He stated that he did not have keys to the factory but that the security guard

would let him in. On the day of the fire, Victor went to his father's office and found his father with Nat. While in the office, Victor told his father that he wanted to come back to the building later that evening to get some work done. The defendant overheard this request and told Victor, "No, you are not coming back here." Trial Tr. at 1490. Jack told Victor that he should listen to Nat and not return to the building. While this conversation was occurring, Victor observed Abraham Weiser enter the office and tell the Defendant and Jack that he was closing the third floor. Victor testified that the Defendant told Weiser, "No, don't close up the third floor, I'm going to close it." Trial Tr. at 1491.

Victor Schlesinger did not return to the factory until the Monday following the fire. He testified that he observed substantial damage in the building and described it as a "whole mess." Trial Tr. at 1493. When Victor went to see his father Jack in the second floor office that day, he found the defendant with him. The defendant was telling Jack Schlesinger to go slow in starting up the business because adjusters needed to come down and assess the damage. While they were in the office, the defendant's son David Schlesinger entered the room and stated "job well done." Trial Tr. at 1500. Victor testified that the statement was made with bravado as a "happy thing," despite the fact that he was standing in the midst of the damage resulting from the fire. The Court notes that the testimony was erroneously transcribed as "bragado [sic], happy things," instead of "bravado." Trial Tr. at 1500.

Counsel for the defendant rigorously cross examined Victor Schlesinger, often questioning his responses until, on occasion, he changed his testimony. For example, Victor Schlesinger first testified that he did not have much of a relationship with the defendant and was not involved in any litigation with him. However, after several questions, Victor Schlesinger readily admitted that he had a "bitter relationship" with the defendant and they were involved in ongoing civil litigation. Victor Schlesinger also admitted that he contacted Atlantic Mutual and first told them about the insurance fraud scheme because he was angry and had his suspicions about the fire, and because Nat Schlesinger was transferring a lot of "things that my father supposedly had." Trial Tr. at 1512.

Victor Schlesinger was further questioned about the family dispute with Nat Schlesinger. He testified that Nat Schlesinger had cancelled Jack Schlesinger's medical insurance and forced Jack's daughter Miriam Schwimmer, who is also Israel Schwimmer's wife, out of the family residence, which made Jack Schlesinger's wife and the rest of her family very upset. Victor Schlesinger admitted that he and Miriam Schwimmer had a "bitter, bitter, bitter, family feud ..." beginning after Jack Schlesinger passed away and lasting up until the present with the defendant and his family. Trial Tr. at 1522.

Finally, counsel for the defendant questioned whether Victor Schlesinger "w[as] in business in Minnesota." Trial Tr. at 1513. Victor Schlesinger responded "Never." He was also asked about Gary Schlesinger and Michael Schlesinger, who he identified as being the same person, namely, his younger brother. Victor Schlesinger further stated that he was not aware of any legal problems facing Gary Schlesinger.

### vii. Testimony of Israel Schwimmer

Israel Schwimmer, who is Jack Schlesinger's son-in-law, worked at Goodmark Industries for several years. The Court notes that Schwimmer's responses to all of the questions during both direct and cross

examination in his trial testimony were generally short, and were often only one word answers. He testified that on the day of or a day prior to the December 31, 1998 fire he observed the defendant and his son David Schlesinger removing about four or five bags of papers from the defendant's file cabinets. Schwimmer testified that before he left on the day of the fire he stopped in to see Jack Schlesinger in the main office. While in the office he overheard a conversation between Abraham Weiser and the defendant. Weiser told the defendant that he was going to lock up the third floor for the day. The defendant told Weiser that he would take care of locking up the third floor that day. Israel Schwimmer testified that he left the building at about 5:00 pm that day and went to his home in Monroe, New York. Schwimmer noted that Jack and Nat Schlesinger remained at the factory in the second floor office.

Israel Schwimmer then testified with regard to the events that took place the Monday following the fire, which was the first day the owners were allowed back into the factory. Israel Schwimmer testified that he went to the main office where he saw the defendant with Jack Schlesinger, Milton Jacobi, Abraham Weiser, and the defendant's son, Sam Schlesinger. There, Schwimmer overheard a conversation between Nat Schlesinger and his son Sam Schlesinger, who was an insurance claims adjuster. The defendant told him to "put together a nice claim" and to "put everything, new fabric, old fabric, whatever he could put in the claim." Trial Tr. at 508–09. Israel Schwimmer also testified that later he was outside the second floor office when David Schlesinger entered proclaiming "a job well done." Trial Tr. at 510. Schwimmer testified that the defendant replied to that statement by saying, "[w]e will wait for the claim that is going to go through." Trial Tr. at 510.

Schwimmer was also subjected to a thorough cross-examination by defense counsel. During cross examination Schwimmer reluctantly testified about the animosity that existed between Jack Schlesinger's family and Nat Schlesinger and his family. Schwimmer admitted to a violent altercation between him and the defendant's son, David Schlesinger, which resulted in Schwimmer's arrest, and also about the pending civil litigation between the two families.

### viii. Additional Evidence of Arson

The government introduced documentation of the fraudulent insurance claim submitted at the direction of the defendant following the 1998 fire that was drafted by David Steinberg. This fraudulent claim also included an estimate from the defendant's fictitious company, G.I.I. Engineering. To show that the company was fictitious, the government introduced the defendant's statement given in an examination under oath to Atlantic Mutual, in which he admitted that he created G.I.I. Engineering. Finally, the government also introduced evidence showing that the fire was confined to the third floor, where the clothing stock was stored, but where there was no valuable machinery to damage.

### 3. The Defense

The defendant presented evidence of a bitter family dispute between him and the family of his brother Jack, who passed away in 2001, including Jack's son Victor Schlesinger. The defendant recalled Abraham Weiser to the stand to refute the allegations made by Victor Schlesinger and Israel Schwimmer. Weiser testified that Nat Schlesinger never told him not to lock the third floor the night of the fire. In fact, he did not even speak to him before

he left. In addition, he stated that Victor Schlesinger had an office in the building at one point in time but in December 1998 that office had been converted into another office. Weiser also testified that the guard that Victor stated had let him in at night when the factory was locked had died in 1995 and that no replacement was ever hired. Weiser also stated that in addition to finished garments there were many old religious books that the Defendant had stored on the third floor. Further, he stated that he approached some of the witnesses that testified at the trial about lying on the stand and "they just say they want to fix Nat." Trial Tr. at 2451, 2458.

A substantial portion of the defense's summation to the jury was spent attacking the credibility of Victor Schlesinger. Counsel described Victor Schlesinger as a person who "has every motivation in the world to fabricate and implicate his uncle who he hates to the core. . . ." Counsel argued that there was ample evidence to show that he tipped the insurance company due to the bitter dispute he and his family had with Nat Schlesinger, and further argued that he testified for the government for the same reason. Counsel urged the jury to believe that Victor Schlesinger lied to them for "[t]hree reasons: Revenge, hatred and greed . . . he wants his uncle out of the way." Trial Tr. at 2701.

### 4. Verdict

On May 19, 2005, after a four week jury trial, and three days of deliberation, the jury returned a verdict of guilty on thirty of thirty-one counts. Nat Schlesinger was convicted of one count of arson and one count of use of fire to commit a felony in connection with the December 31, 1998 fire. In addition, Schlesinger was convicted of one count of conspiracy to commit mail and wire fraud with regard to insur-

ance claims, thirteen counts of mail fraud, and two counts of wire fraud on the insurance claims, and one count of conspiracy to engage in monetary transactions with insurance fraud proceeds in connection with the scheme to fraudulently inflate insurance claims on the losses suffered as a result of the 1998 fire and four other fires that occurred at the factory. Nat Schlesinger was also convicted of one count of conspiracy, four counts of mail fraud, and three counts of engaging in monetary transactions with fraudulent proceeds resulting from a second scheme to defraud the creditors of the clothing manufacturing businesses that he controlled.

### C. The Post Trial Motions

#### 1. The Rule 29 Motion for a Judgment of Acquittal

After the trial, the defendant moved pursuant to Fed. R.Crim. Proc. 29 for a judgment of acquittal arguing that the verdict was based upon mere speculation and surmise. The defendant further moved to strike, as inadmissable hearsay, the testimony of Victor Schlesinger as to the statement "job well done" made by David Schlesinger in the days following the fire. The defendant also contended that notwithstanding the admissibility of that statement, there was no proof that the defendant aided, abetted, or participated in setting the 1998 fire.

On June 8, 2005, the Court denied the defendant's motion for a judgment of acquittal. *See United States v. Schlesinger,* 372 F.Supp.2d 711 (E.D.N.Y.2005). As to the evidentiary issue, the Court found that the statement "job well done" along with the circumstances in which it was made satisfied the requirements to be admitted into evidence under Rule 801(d)(2)(E) of the Federal Rules of Evidence ("Fed. R.Evid."). In addition, the Court found that the statement "job well done" could

also be admissible under Fed.R.Evid. 803(1) as a present sense impression exception to the hearsay rule. *Id.* at 721.

The Court also analyzed the sufficiency of the government's evidence supporting the arson conviction and the use of fire to commit a felony conviction and found that "the circumstantial evidence the Government offered tended to show that Schlesinger had the motive, means, and opportunity to commit the crime, as well as consciousness of guilt." *Id.* at 723. Although the Court had initially commented at the trial that the evidence appeared weak, upon further review the Court found that the circumstantial indices of guilt were supported by ample evidence to show that the fire was intentionally set; that the defendant had a motive to set the blaze in order to recover insurance proceeds; and that he had the opportunity to commit the crime. The Court also noted that the jury had a right to consider the defendant's suspicious behavior after the fire in his interaction with Fire Marshal Santangelo as a display of consciousness of guilt. *Id.* at 724.

As to the two witnesses that are called into question in the instant motion for a new trial, the Court found that "[t]estimony from both Israel Schwimmer and Victor Schlesinger showed that the Defendant impliedly acknowledged the criminal act and substantiated the motive for the arson." *Id.* The statements they overheard about putting together a "nice claim" and to take it slow in restarting the business could be viewed as part of the circumstantial evidence in support of the arson verdict. In addition, they overheard the defendant's son David exclaim "job well done" and the defendant reply that, "[w]e will wait for the claim that is going to go through." These statements were part of the evidence that permitted the jury to find that the defendant had knowledge and involvement in aiding and abetting or causing the fire.

Ultimately, the Court concluded that "all of the evidence presented was more than sufficient, when taken together, to establish, beyond a reasonable doubt, that Schlesinger either participated in or aided and abetted in the arson involving the 1998 New Year's Eve Fire in his building in order to submit a fraudulent insurance claim." *Id.* at 724–25.

## 2. The First Rule 33 Motion for a New Trial

The Defendant then moved for a new trial under Fed.R.Crim.P. 33, advancing similar arguments. The defendant argued that the only evidence linking him to the arson counts was adduced through the testimony of Victor Schlesinger and Israel Schwimmer, whose testimony, he contended, was patently incredible and constituted inadmissible hearsay.

The Court denied that motion, ruling that the testimony of the two witnesses could not be considered incredible as a matter of law because it was not patently incredible nor did it defy physical realities. *United States v. Schlesinger*, 396 F.Supp.2d 267, 270–71 (E.D.N.Y.2005).

## 3. The Second Rule 33 Motion for a New Trial

On, February 3, 2006, the defendant filed the instant motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The motion seeks a new trial on the basis of newly discovered evidence with regard to the arson counts of the indictment and dismissal of the remaining counts of the indictment on the basis of prosecutorial misconduct that violated defendant's due process rights and other rights secured by the Constitution.

The defendant claims that the newly discovered evidence set forth in this latest motion shows that Israel Schwimmer and Victor Schlesinger committed perjury when they testified as to Nat Schlesinger's involvement in the 1998 fire. In addition, the defendant alleges that newly discovered evidence reveals that Schwimmer and Victor received promises of leniency from the government in return for their cooperation, and that this information was withheld from the defense. Further, the defendant claims that the government withheld information about the involvement of Victor Schlesinger in a business located in Minnesota that was under a government investigation.

### i. The Alleged Newly Discovered Evidence

#### (a) Israel Schwimmer's Recantation

In support of this motion, the defendant submitted several compact discs containing audio recordings, along with a transcript ("Def. Ex. A to the Rule 33 Mtn."), of an interview that his new counsel, Michael L. Soshnick, Esq., conducted with Israel Schwimmer on September 9, 2005. The interview was conducted in Soshnick's law office and was recorded without Schwimmer's knowledge. Israel Schwimmer came to the interview accompanied by Abraham Lichtenstein, who the defendant characterizes as Schwimmer's "confidante." Also present at the meeting were Soshnick's investigator John Dabrowsky, and defendant's co-counsel Adrian L. DiLuzio, Esq.

The meeting lasted more than two hours and mostly involved a wide-ranging discussion of the history of the disputes between the Nat Schlesinger and the Jack Schlesinger families. The manner in which Israel Schwimmer discussed the dispute between the families was substantially different from his testimony on the stand at the trial. His answers were lengthy, at times detailed, and at times rambling and irrelevant. Schwimmer was extremely talkative and sounded anxious to speak, often cutting off the other participants in the interview, or changing the subject of the conversation unexpectedly.

Schwimmer described at length why the two sides of the family essentially hated each other over disputes that in large part arose after Jack Schlesinger died. The claim of Jack's family members was that Nat Schlesinger was trying to cheat them out of millions of dollars. As a result, Schwimmer stated that they were involved in intense litigation to get their perceived fair share. Some of the litigation involved disputes over personal residences.

Schwimmer stated that his brother-in-law Victor Schlesinger called Atlantic Mutual after the 1998 fire "because we were fighting about my house, we were fighting about the [estate of Jack Schlesinger], the money, and we saw we couldn't get out anyway." Def. Ex. A to the Rule 33 Mtn. at 28. Schwimmer continued on to state that the call that Victor made contained "a lot of lies" to Atlantic Mutual when he informed them that Nat Schlesinger caused the fire and that Nat called it a "job well done."

Schwimmer stated that he had pressure from his mother-in-law, his wife, and his brother-in-law to back the lies that Victor told to Atlantic Mutual. Once Victor made statements to the government, Schwimmer stated that he was brought into the lie "in order to make this look a hundred percent . . ." and was told what to lie about and what to say. Def. Ex. A to the Rule 33 Mtn. at 31–32.

In response to a question of whether Schwimmer received "a secret promise" from the government to testify, Schwimmer responded: "I never got anything." Def. Ex. A to the Rule 33 Mtn. at 34–35.

Soshnick persisted, by asking, "What I'm hearing from you is that it was your understanding that if you testified against Nat, no harm would come to you or your family members." Schwimmer responded, "To tell you the truth, no, no written, no written promise, no nothing, no written promise, no nothing." Def. Ex. A to the Rule 33 Mtn. at 34–35.

The interview continues with Schwimmer explaining why he decided to change his testimony. Schwimmer explains: "The Torah, the Jewish law, ... the law says over there, even Nat, even somebody bother you he threaten you—I'm not talking about killing—you're not allowed to go testify against another Jew." Def. Ex. A to the Rule 33 Mtn. at 44.

In response to Soshnick's questioning, Schwimmer easily responds that he "was lying by the Grand Jury and by the trial." Def. Ex. A to the Rule 33 Mtn. at 56. However, when pressed by Soshnick and Diluzio for details, Schwimmer only admitted to lying about two parts of his testimony, and actually reaffirmed most of the remaining part of his trial testimony. When asked whether he saw Nat Schlesinger removing papers from the building prior to the fire, Schwimmer stated, "That's a problem. That's true. Because you know why? ... My wife saw that too." Def. Ex. A to the Rule 33 Mtn. at 57. Schwimmer explains, in more detail than he testified to at the trial, that he saw Nat moving about four shopping bags of paperwork. When he saw this he called his wife on the telephone and said, Nat is moving paperwork. She watched from the window of her home and also saw him taking out the paperwork.

When asked about his testimony about overhearing the statement "job well done," Schwimmer responded that this was "Baloney" and a "real, real, lie." Def. Ex. A to the Rule 33 Mtn. at 59. He also describes this testimony as "Bullshit," and "It's a lie." Def. Ex. A to the Rule 33 Mtn. at 90–91. When asked about whether he heard Abraham Weiser state that he was going to lock up the third floor, Schwimmer responded, "Bullshit." Def. Ex. A to the Rule 33 Mtn. at 87–88. However, when pressed for details, Schwimmer indicates that he really could not recall what he testified to at the trial, but insists that whatever it was, it is a lie. For example, Dabrowsky asks if he recalled the conversation between Weiser and Nat Schlesinger, Schwimmer responds "That what—what? ... What I keep forgetting, it's a lie." Def. Ex. A to the Rule 33 Mtn. at 95.

During the interview Soshnick tells Schwimmer that Dabrowsky is going to prepare an affidavit for him to sign that would state that he recants his prior testimony. However, upon completion of the interview, Israel Schwimmer advised the other participants that, before swearing to and signing an affidavit embodying the essence of the conversation, he wished to speak with his own attorney. He wanted to do this because he had been advised that neither Soshnick nor DiLuzio could serve as his attorney. Schwimmer asked for a week to consider the request to sign and swear to an affidavit. Counsel for the defendant did not further hear from him. Schwimmer never signed an affidavit or otherwise confirmed his statement about the interview, under oath.

### (b) Signed Statement of David Ganz

In addition to the taped interview, the defendant submitted numerous statements from persons who purport to know Israel Schwimmer in order to corroborate his recantation. David Ganz, described as a seventy year old father of five who knew the defendant and his brother Jack from as far back as 1957, signed a statement prepared by the defendant's investigator.

In the statement, he claims to have met Israel Schwimmer at the Schlesinger business some two and one-half years ago. He states that he spoke to Schwimmer about resolving the money dispute between the families that also involved Schwimmer's house. Schwimmer's response was: "I will do whatever I can to bury Nat alive." Def. Ex. C to the Rule 33 Mtn.

### (c) Ruling by Rabbi Gruber on behalf of the Rabbinical Court (Beis Din Tzedek)

Prior to the meeting with Soshnick, Israel Schwimmer allegedly went to Rabbi Y. Gruber to seek guidance. The defendant claims that Schwimmer told Rabbi Gruber that he was under duress from his wife's family, and that such duress caused him to testify falsely against the defendant at the trial. Schwimmer allegedly further advised Rabbi Gruber that he wanted to correct his wrongdoing even though he understood that, as a result of doing so, he could be legally punished for his false testimony. Rabbi Gruber advised him that he must do everything he could to recant his testimony.

After Schwimmer met with Soshnick, Rabbi Gruber believed that Schwimmer had not done the "utmost" to recant, but that he had merely attended the meeting with Soshnick. As a consequence, on September 29, 2005 Rabbi Gruber, on behalf of the Rabbinical Court, issued a Beis Din Tzedek, declaring that: "anyone who has influence with Mr. Schwimmer is obligated to convince him that he should not evade from what is incumbent on him to do for the sake of truth and justice." Def. Ex. D to the Rule 33 Mtn.

### (d) Affidavits from Certain Members of Israel Schwimmer's Family

In the defendant's reply to the government's opposition to the motion for a new trial, the defendant submitted additional affidavits of persons related to Israel Schwimmer commenting on his trial testimony, including Israel's father Joseph Schwimmer (Ex. K); Israel's brother-in-law Morris Gelbstein (Ex. L); Israel's brother Berish Schwimmer, (Ex. M); and Israel's sister Sarah Rosenfeld (Ex. N).

Joseph Schwimmer's affidavit states that his son "personally informed me that he did not testify truthfully at the trial of Nat Schlesinger." In addition, "[h]e further told me that he was under tremendous pressure from his wife's family because they wanted revenge against Nat Schlesinger." Joseph Schwimmer also states that Israel told him that he felt sorry for what he had done. Joseph also opined that Israel is in psychiatric care "as a result of the tremendous pressures put on him by his wife's family." Def. Ex. K to the Reply to the Rule 33 Mtn.

Morris Gelbstein states in his affidavit that he had a conversation with Israel Schwimmer in the Fall of 2005, in which Schwimmer told him that "people could not understand how much pressure he was under from his wife and her family, and that his actions would be seen differently if they could only understand what he was going through." At one point, Gelbstein states that he told Israel that Nat thought he could win at the trial, to which Israel replied: "He didn't know that he was fighting against my wife." Def. Ex. L to the Reply to the Rule 33 Mtn.

Berish Schwimmer states in his affidavit that he spoke to his brother many times before and after the trial. He states that before the trial, Israel "told me that his wife's family planned to teach Nat Schlesinger a lesson." After the trial, Israel was upset that he had given false testimony, but felt he had no choice because of pressure from his wife and the government. Israel told him that he was threatened by

the government to be put in jail if he backed out of testifying at the trial by claiming a loss of recollection. Berish Schwimmer also claims that he has "been witness to the abuse of my brother by his wife." She allegedly ridiculed Israel in front of him, "calling him 'useless' and 'a coward who can't sleep at night' because he was afraid of giving testimony in court." Berish also claims that Miriam Schwimmer took away Israel's mobile phone.

Berish Schwimmer also refuted the notion that Israel was under adverse community pressure because he testified at the trial. "At no point has there been any organized community pressure against my brother. On the contrary, although certain individual members of the community may be angry with him, the rabbis and community leaders have expressed their sympathy and concern for him." Berish also noted that "[m]y brother has told me on numerous occasions that he lives in terror of his wife and her family." Def. Ex. M to the Reply to the Rule 33 Mtn.

Sarah Rosenfeld claimed in her affidavit to have witnessed Israel being "abused" by his wife. She claimed that his wife on prior occasions had taken his glasses, driver's license, and mobile phone, hit him, and threw him out of the family home. Def. Ex. N to the Reply to the Rule 33 Mtn.

### (e) Signed Statements of Members of the Community Regarding Victor Schlesinger's Testimony

The defendant annexed four signed statements provided to defense investigators stating that Victor Schlesinger had lied to the government and at the trial. David Ganz signed a statement describing a conversation he had with Victor at or near Passover, 2005. Ganz claims that Victor Schlesinger told him he was making up stories about Nat setting the fire in question. Ganz advised him "not to com-mit such a capital crime as to make up a lie about Nat Schlesinger." In the discussion that ensued, Victor grew increasingly angry and yelled that "he would do and say anything and whatever it takes to bury Nat for life." He admitted that he would lie to get revenge for his mother and acknowledged that he could lie about the "fire case." Def. Ex. C to the Rule 33 Mtn.

Moshe Kestenbaum, described as a forty-seven year old Brooklyn resident, provided a signed statement in which he revealed conversations with Victor Schlesinger regarding the monetary dispute between the families. Victor told him that, if he could not get the money, he would put Nat in jail, and that he would tell the government a few things and they would believe him because the defendant was a convicted felon. He further told Kestenbaum that the allegations he made didn't have to be true, and that he was capable of making up a good story that would put Nat in jail. After Nat's indictment, Kestenbaum declared that Victor crowed: "Now do you believe me what I told you a long time ago." Def. Ex. E to the Rule 33 Mtn.

Moses Friedman, described as a fifty-seven year old father of eight, provided a signed statement describing how, at Jack Schlesinger's shiva, he endeavored to reconcile the family dispute. Victor told him it was his desire to get Nat and that he could get a watermelon indicted. Def. Ex. F to the Rule 33 Mtn.

Luzer Endzwerg, stated that he prayed at the same schul as Victor Schlesinger and was aware that he was fighting over money with his uncle Nat. He claims that "other people who prayed there expressed doubt that [Victor] would ever get his money." Victor assured them he would because "I will put him in jail." Def. Ex. G to the Rule 33 Mtn.

### (f) Affidavit of Private Investigator Warren Flagg

In support of his claim that the government failed to reveal promises of leniency and impeachment evidence of which it was aware regarding Victor Schlesinger prior to the trial, the defendant attached an affidavit from private investigator Warren Flagg. In the affidavit, Flagg claims that he contacted Keith Hoheimer, the Special Agent in charge of investigations for the Chicago office of the Small Business Administration ("SBA") regarding a prior investigation by the SBA into bank fraud allegations against Foodland Industries. Foodland Industries is a rice cake manufacturing business located in Brooklyn, New York, that was co-owned by Victor and Michael Schlesinger. According to the investigation, Foodland Industries fraudulently attempted to obtain an SBA loan from the Security State Bank. Def. Ex. H to the Rule 33 Mtn.

Hoheimer allegedly told Flagg that Victor and Michael Schlesinger were "subjects of the investigation for bank fraud" and that the case was "a slam dunk." Hoheimer further described the strength of the government's case as follows: "I have never had a stronger false identity bank fraud case presented to the United States Attorney's office in Minnesota." According to Flagg, Hoheimer was so certain that arrest warrants would be forthcoming that he telephoned the New York office of the FBI for assistance in making the arrests of Victor and Michael Schlesinger. However, the case never proceeded because the United States Attorney's office declined prosecution in June, 2004.

Flagg states that Hoheimer was frustrated and wrote a report to the SBA in Washington, D.C., with the hope of having the prosecution reinstated. Counsel for the defendant attempted to obtain the details of reports concerning this investigation, and the reason for its closure, under the Freedom of Information Act. The request was denied on the ground that defense counsel had no standing to request such disclosure.

### (g) Additional Evidence of the Minnesota Investigation

In the defendant's reply to the government's opposition to the motion for a new trial, the defendant submitted additional evidence concerning the Minnesota investigation. This includes affidavits from David Hasskamp, the landlord for Foodland Minnesota; Dennis Baumann, the production manager of Foodland Minnesota; Keith Bjella, the general manager of Foodland Minnesota; Jacob Schwartz, the accountant for Foodland in both New York and Minnesota; and Doron Zanani, Esq., the attorney who at one time represented both corporations. These affidavits provide many details about the alleged fraud. For example, the affidavits include pictures of Victor and Michael Schlesinger and statements from the affiants who live in Minnesota identifying these individuals as persons who were in business in Minnesota.

### ii. The Government's Response

The government opposed the defendant's motion for a new trial after conducting an investigation into the allegations. The government attached affirmations by the agents involved in the investigation and the attorneys involved in the prosecution, stating that there were never any promises of leniency in regard to any alleged criminal conduct by Israel Schwimmer.

The government also attached an affirmation of Miriam Schwimmer, Israel Schwimmer's wife, which states the Schwimmer began to experience intense community pressure prior to his testimony

at the trial and during his testimony by packing the courtroom with Nat Schlesinger supporters. Prior to testifying, Schwimmer was warned that if he testified against the defendant "he would be labeled a 'mosser' (traitor); [his] children would be expelled from the private school they attended and he would be ostracized by the Williamsburg community." Aff. of Miriam Schwimmer at 1.

The affirmation also states that the community pressure did not end with Nat Schlesinger's conviction. In fact, the community pressure increased as the defendant's family and friends began distributing copies of Israel Schwimmer's grand jury testimony and created leaflets advising Schwimmer to leave Williamsburg for his own safety. Schwimmer's children were also allegedly targeted as a result of their father testifying against the defendant. For example, Miriam Schwimmer claims that her son was told he would not be permitted to read from the Torah at his Bar Mitzvah.

The government submitted an affirmation of Victor Schlesinger, reaffirming that his testimony in the grand jury and at trial was accurate. It also states that Victor Schlesinger never met with Schwimmer to create testimony or to create lies to use against the defendant.

In response to the allegations of prosecutorial misconduct, the government conducted an investigation into the Minnesota fraud case. Special Agent Hoheimer reported that the Minnesota Case was premised almost entirely upon information provided by a confidential informant named Samuel Schlesinger, who is Nat Schlesinger's son. In addition, Victor Schlesinger's name did not appear anywhere on any document connected with the subject loan. Further, the SBA never interviewed anyone other than Sam Schlesinger in furtherance of the investigation nor did they contact either target or otherwise notify them of the pending investigation. Special Agent Hoheimer stated that there was no contact about the Minnesota investigation with anyone from the United States Attorneys Office for the Eastern District of New York or any of the agents or government agencies assigned to investigate the Schlesinger case.

Assistant United States Attorney Frank McGill was the AUSA responsible for declining the prosecution of the Minnesota Case. He was interviewed and stated that the United States Attorneys Office for the District of Minnesota declined the case for several reasons, including the age of the loan and the fact that the SBA failed to identify the recipients of the loan proceeds. The United States Attorneys Office for the District of Minnesota took no further action after declining the prosecution. AUSA McGill further stated that he never spoke with any representative of the United States Attorneys Office for the Eastern District of New York, or any of the agents or government agencies assigned to investigate the Schlesinger case.

### D. Post Trial Evidentiary Hearing

On April 21, 2006, the Court issued an order scheduling an evidentiary hearing on the claims of prosecutorial misconduct to resolve the disputed facts and to develop the record on the materiality of the alleged *Giglio* material, as well as the government's actual or constructive knowledge of such information. As to the Schwimmer recantation, the Court stated that although an evidentiary hearing was not required under *United States v. DiPaolo,* 835 F.2d 46, 50 (2d Cir.1987), a hearing would be "helpful in evaluating the credibility and materiality of Schwimmer's alleged recantation that was neither sworn to nor taken under oath." Order dated Apr. 21, 2006 at 7. Further, the Court set the parameters

for this part of the hearing by stating that it would hear "testimony from Israel Schwimmer for, among other matters, testimony as to the alleged recantation of his former testimony during the grand jury and the trial . . .," and "any additional relevant evidence." *Id.*

### 1. Testimony of Israel Schwimmer

On April 21, 2006, the same day the Court ordered an evidentiary hearing, the government produced Israel Schwimmer for the purpose of testifying as to his alleged recantation. At the hearing, Schwimmer essentially repudiated his recantation. Schwimmer explained on direct examination by the government that due to the community pressure he was subjected to after testifying at the trial, he had made certain out-of-court statements that were untruthful. Schwimmer also testified that his trial testimony was the result of a trial subpoena and not in exchange for any promises of leniency from the government. Schwimmer explained that following his testimony at the trial, he was subjected to threats and intimidation from supporters of the defendant in the Williamsburg community. The threats and intimidation tactic employed by supporters of the defendant included berating Schwimmer on the street and in temple; threatening to expel Schwimmer's children from their private religious school; and disseminating transcripts of Schwimmer's grand jury and trial testimony throughout the community.

Schwimmer also testified that he observed numerous leaflets "all over the streets and synagogues" of his neighborhood in Brooklyn advising that people should not speak with him and he should not be allowed in synagogues to pray. One of the leaflets was particularly harsh, "warning" members of the community, and vilifying Israel Schwimmer and Victor Schlesinger. The leaflet was translated from Hebrew to English at the hearing, as follows:

Warning!

Everybody knows that the two named informants are sinners of Israel, the known bad and cruel persons, are Victor Schlesinger, may his name be erased, together with his brother-in-law who has at the same time, who have together informed almost about almost ten Jewish people who had committed no sin. This is the bad person Israel Elimelech Schwimmer. May his name be erased.

They went with unheard cruelty and informed about their uncle with lies and inventions Naftali Zvi Schlesinger. And they caused that he should be sitting and suffering in a heavy jail, suffering both in his body and in his soul. And he's expecting a heavy sentence from the judge towards a life-long imprisonment. May the Lord have pity on him.

The Lord will not allow it. And it this was not enough, and in the last few days that when the Judge is getting ready to render his sentence Jews are watching and praying to the Lord for a lighter sentence.

He went their mother, their mother, the bad women Fareidel Schlesinger, who hides herself behind the persona of innocent and broken widow and they submitted damaging information and, together with lies and falsehoods, as is their way, in order to add fuel and secure that the[ir] will be no room for commiseration from the judge.

Warning. Those dark sinners have still not taken into consideration Zvi as how the Jewish blood is being spilled from Naftali Zvi, Ben Hirifka.

Dear Jews: How can we stand by with indifference? How can we say that our hands have not spilled that blood? Let us spit them out from the community of Israel.

There also must be a roaring scheme that they are not pure, the two dark sinners and criminal who try all the time to hide behind the one that is sending them to speed evil and this is the bad person Scmuel Yona Schlesinger and his brother, the known person and enemy, the usurper, Gershon Schlesinger, who run around all the time threatening whoever is standing in their way. Remember, it is the time for judge and judgment.

Gov't Ex. 1, Hr'g Tr. 327–29. After this was read in Court, Israel Schwimmer appeared visibly upset and in obvious distress.

The defendant's counsel conducted an excruciatingly thorough cross-examination of Schwimmer that, according to the government, lasted for more than 11 hours over the course of three days. During the course of his testimony on cross-examination Schwimmer was evasive and non-responsive. Schwimmer often asked for the question to be repeated and responded time and time again that he could not recall anything from the interview conducted by Soshnick where he recanted his trial testimony, due to the enormous community pressure he was under. Defense counsel read portions of the transcript and played numerous sound recordings in an attempt to refresh Schwimmer's recollection. Although Schwimmer reluctantly acknowledged that it was his voice on the recording and that he was in Soshnick's office at the time, the plethora of attempts at refreshing his recollection as to the substance of the interview were all unsuccessful. After reading the transcript of the interview Schwimmer stated, "I read some portion of the transcript, and I see it and I don't know how I said it. It can't be, because I testified truthfully at the trial." Hr'g Tr. at 170.

Faced with a blistering cross-examination, Schwimmer apparently resorted to admitting to a series of unlikely questions that were repeated by defense counsel throughout the lengthy examination. For example, upon questioning from defense counsel, he admitted he was "drugged" by Abe Lichtenstein on their way to Soshnick's office, and that Lichtenstein told him to "drink, drink, drink" from two "colorful" bottles on the dashboard of his car. Hr'g Tr. at 78–81, 83–84. He claimed that, as a result of the drugging, he was "dizzy," "sweating all over," and was not in his "full mind." Hr'g Tr. at 71, 77, 82. He additionally asserted that he was forced to remain at this meeting because he was "trapped" by people stationed at the door who prevented him from leaving the office. Hr'g Tr. at 75, 80–81.

However and significantly, during the cross-examination Schwimmer continually re-affirmed that he had provided truthful testimony during the trial of Nat Schlesinger. For example, Schwimmer stated "I never lied at the trial or in the grand jury." Hr'g Tr. at 146. "Again, whatever I testified at the grand jury and the trial, that's the truth." Hr'g Tr. at 148. "The trial was true. The grand jury was true." Hr'g Tr. at 171. "I told you the truth before, that I never lied on the trial, so what do you want now?" Hr'g Tr. at 217. "I never lied." Hr'g Tr. at 282. "I said I never lied in the grand jury." Hr'g Tr. at 287. "I did not perjure myself." Hr'g Tr. at 311.

When questioned by the Court, Schwimmer also confirmed that his trial testimony was truthful and that he went to Soshnick's Office only to relieve the adverse community pressure.

THE COURT: He is asking you, when you came to his office and you said it was for the purpose of taking off the

pressure as Mr. Lichtenstein said he would do, right?

THE WITNESS: Yes.

THE COURT: When you told these things to Mr. Soshnick in his office, were you telling the truth?

THE WITNESS: I didn't, no.

THE COURT: You didn't say the truth?

THE WITNESS: At his office, no.

THE COURT: Pardon?

THE WITNESS: At his office I didn't say the truth.

THE COURT: You did not say the truth?

THE WITNESS: In his office, no.

Hr'g Tr. at 168.

### 2. Testimony of Abraham Lichtenstein

Abraham Lichtenstein accompanied Israel Schwimmer to the meeting with Soshnick. Lichtenstein described himself as an active and official community liaison in the Williamsburg community. Hr'g Tr. at 450. Lichtenstein testified that Schwimmer approached him in the beginning of August 2005 and asked him to help him because he had told lies before the grand jury and at the trial. In response, Lichtenstein offered to take him to see Nat Schlesinger's attorney, and Schwimmer told him that he would go anywhere "as long as I can come in and say the truth." Hr'g Tr at 441. Schwimmer revealed to Lichtenstein that he was hesitant to cooperate with him, saying that his wife would "kill" him. Hr'g Tr. at 441. Lichtenstein stated that on the day he picked him up to go to Soshnick's office, Schwimmer threw himself on the floor of the car so that he would not be seen until he had left his neighborhood.

On cross-examination, Lichtenstein admitted that he had known the defendant Nat Schlesinger for approximately 15 years and that one of the reasons that

Schwimmer contacted him "was that he knew [Lichtenstein] was friends with the defendant Nat Schlesinger." Hr'g Tr. at 458, 465. Lichtenstein also testified that Schwimmer asked him "to tell the defendant to stop his children from putting pressure in the community." Hr'g Tr. at 468. In addition, Lichtenstein admitted that in the past he had sold materials to Victor Schlesinger and that the business relationship between the two had ended in litigation.

### 3. Testimony of Susan Necheles, Esq.

Susan Necheles, Esq., a criminal defense attorney, testified that she was contacted by individuals from the Satmar Hasidic community and asked if she could represent Israel Schwimmer. Necheles was unable to recall who first contacted her about representing Schwimmer, but in response she set up a preliminary meeting. Necheles testified that the preliminary meeting was not attended by Schwimmer but by four or five men who she could not identify except for saying that she thought they were members of the Satmar Hasidic community. In the meeting she stated she needed to meet with Schwimmer in order to represent him in a matter. This meeting was eventually arranged.

Prior to meeting with Schwimmer, Necheles stated that she was confronted by Schwimmer's wife while at work in her law office. Necheles testified that Mrs. Schwimmer barged into a meeting she was conducting in her office and told her not to meet with her husband. Mrs. Schwimmer told her that her husband had been kidnaped and that if he did meet with her it was not of his own free will.

Necheles eventually did meet with Schwimmer on March 5, 2006, under unusual circumstances. Schwimmer was brought to Necheles' home by "two or three other men ... all named Schwim-

mer." Hr'g Tr. at 630. Necheles inquired about whether Schwimmer was attending of his own free will and he told her that he was. Schwimmer stated that he had been beaten by his wife and that she had taken his glasses and medication away from him. Necheles then proceeded to speak to Schwimmer and the unidentified individuals about lying at the trial, and agreed to represent him if he paid a $25,000 retainer. Part of this retainer, in the amount of $10,000, was eventually paid by someone who she could not identify.

During the meeting Schwimmer told Necheles that he had a meeting with Soshnick at which he said that he lied at the trial. Schwimmer further stated that he had been pushed to testifying at the trial by his wife's family and that such testimony violated his religious beliefs. As to specific testimony, Necheles stated that Schwimmer told her that at the trial he had lied about: (1) the statement "good job;" (2) knowing the content of the documents that were removed from the building; and (3) the statement "don't lock the doors." Hr'g Tr. at 634.

Necheles also testified that Schwimmer discussed the religious edict that was issued by Rabbi Gruber declaring that he needed to tell the truth about lying at the trial. Necheles explained that there exists a Jewish teaching known as "maseera," which prohibits Jews from going to civil authorities to bring disputes with other Jews. Instead, they should bring those disputes to the religious authorities in the religious court known as Beis Din Tzedek. She further explained that a "mooser" is somebody who goes to authorities and tells about other people in the community. Necheles stated that Schwimmer told her that the religious edict issued about him involved "maseera."

One or two days after the meeting Necheles received a letter purporting to be from Schwimmer, requesting that she be discharged as his counsel and return the retainer. Necheles stated that she did nothing in response to the letter, but understood that her services had been terminated. She did not return the $10,000 retainer or attempt to collect the remaining $15,000.

### 4. Testimony of Doran Zanani, Esq.

Doran Zanani, Esq., testified about his representation of Foodland Industries, the rice cake manufacturing business located in Brooklyn, New York, that was co-owned by Victor and Michael Schlesinger. He stated that he was retained by Foodland Industries in order to create a second Foodland entity in Minnesota. Zanani testified that to the best of his knowledge Victor Schlesinger was not a record owner or shareholder of the Minnesota-based Foodland Industries entity. Zanani's dealings in connection with the Minnesota-based Foodland entity were principally with Gary Schlesinger whom he believes is the record owner of the entity and who filed a bankruptcy petition on its behalf. Zanani testified that he had conversations with an individual named Victor Schlesinger who told him that he had provided "funding" for the Minnesota-based Foodland Industries entity. Zanani believed Victor Schlesinger had a financial interest in the company and that he was exerting influence over the corporation through his brother Michael Schlesinger.

### 5. Testimony of Government Agents in the Minnesota Investigation

Keith Hoheimer of the SBA's Office of the Inspector General was the supervising agent in the Minnesota investigation. The investigation was assigned to Special Agent Tom Heinzer. Hoheimer testified that he initiated the investigation into Michael and Victor Schlesinger in February

2002 after receiving a tip from Sam Schlesinger, the defendant's son. The investigative matter concluded when the United States Attorney's Office in Minnesota declined to prosecute the case on the grounds that the loan was old and the information developed was not sufficiently material to develop a prosecution.

Hoheimer stated that he had no contact with anyone from the United States Attorney's Office for the Eastern District of New York regarding the Minnesota investigation. Hoheimer testified that the only contact he had with any government agents located in New York was with Special Agent Charles Walkowiak of the Federal Bureau of Investigations in New York and with Postal Inspector Rich Delisio of the United States Postal Inspection Service in New York. Hoheimer contacted Walkowiak to request help with the investigation in New York. Delisio assisted Hoheimer in inquiring about a bankruptcy filing made by Gary Schlesinger.

Heinzer also testified that he had no contact with anyone from the United States Attorney's Office for the Eastern District of New York regarding the Minnesota investigation. Heinzer testified that the only additional contact he had with New York agents involved a request in an unrelated matter to provide assistance with a photo lineup of subjects in an investigation.

The two New York based agents that were contacted about the Minnesota investigation also testified. Special Agent Charles Walkowiak of the FBI testified that he received a telephone call from Hoheimer, concerning an alleged fraud perpetrated by a man named "Schlesinger." Agent Walkowiak testified that he received some paperwork from Hoheimer summarizing the investigation of Foodland Industries, and that he merely reviewed FBI indices because he recalled a reference to Foodland in an earlier investigation he had conducted. Agent Walkowiak testified that he took no action in the investigation because he did not know how he could "help on a case with a violation that allegedly occurred in Minnesota...." Hr'g Tr. at 494. Agent Walkowiak confirmed that he did not contact anyone at the United States Attorney's Office for the Eastern District of New York in connection with the matter because he "had nothing to present." Hr'g Tr. at 497–98.

Postal Inspector Delisio also testified that he had no contact with anyone from the United States Attorney's Office for the Eastern District of New York regarding the Minnesota investigation.

## II. DISCUSSION

### A. The Legal Standard in a Motion for a New Trial

Rule 33 permits a defendant to seek a new trial based on newly discovered evidence within three years of the verdict. The rule states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Crim.P. 33. This standard gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133, 134 (2d Cir.2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). In deciding the motion the district court must examine the entire case and may weigh the evidence and the credibility of witnesses, but it must be careful not to "wholly usurp" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir.2000). Rule 33 authority should only be used "sparingly" and in "the most extraordinary circumstances." *Sanchez*, 969 F.2d at 1414.

The Second Circuit has frequently and repeatedly held that, "even where newly discovered evidence indicates perjury, motions for new trials 'should be granted only with great caution and in the most extraordinary circumstances.'" *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir.2006); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993); *Sanchez*, 969 F.2d at 1414 (2d Cir.1992); *DiPaolo*, 835 F.2d at 49; *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975); *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.1958).

■ Generally, in a motion for a new trial based on newly discovered evidence the defendant must initially make the threshold demonstration that the proffered new evidence: (1) could not have been discovered with due diligence before or during the trial; (2) is material; and (3) is not cumulative. *See United States v. Canova*, 412 F.3d 331, 349 (2d Cir.2005); *United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir.2000); *United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992); *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980). It is within this general framework that the Court will wade through the great amount of alleged new evidence that the defendant has submitted in support of his motion for a new trial.

**B. As to Israel Schwimmer's Recantation**

■ The most substantial item of newly discovered evidence submitted in this motion for a new trial is the surreptitiously recorded recantation of Israel Schwimmer. Courts have long been "particularly reluctant" to grant a motion for a new trial "where the newly discovered evidence consists of a witness recantation as such re-cantations are 'looked upon with the utmost suspicion.'" *DiPaolo*, 835 F.2d at 49 (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954)); *see Gallego*, 191 F.3d at 165; *Bagby v. Kuhlman*, 932 F.2d 131, 136 (2d Cir.1991) ("[T]here is overwhelming reason to question the statements' genuineness."); *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (1975); *Harrison v. United States*, 7 F.2d 259, 262 (2d Cir.1925).

■ When the proffered new evidence consists solely of a recantation, in order to succeed on a motion for a new trial the defendant must prove: (1) the testimony recanted was both false and material; (2) without the false testimony the jury probably would have acquitted the defendant; and (3) that the party seeking the new trial was taken by surprise when the false testimony was given and could not address that falsity until after the trial. *DiPaolo*, 835 F.2d at 49; *Stofsky*, 527 F.2d at 246; *United States v. Lespier*, No. 398CR102AHN, 2006 WL 533792, at *7 (D.Conn. March 1, 2006). The defendant bears the burden of satisfying each of the elements in the three-part test. *Id.*; *DiPaolo*, 835 F.2d at 49 (citing *United States v. Brown*, 582 F.2d 197, 202 (2d Cir.1978)). Schwimmer's taped recantation falls far short of proving either of the first two prongs.

**1. The Scope and Materiality of the False Testimony**

Initially turning to the second element, the Court does not find that without the recanted testimony the jury may have reached a different verdict. Although the attorneys for the defendant consistently argue throughout all phases of the motion in broad and sweeping language that Schwimmer lied to the grand jury and at the trial, a closer examination of the two hour taped interview reveals that Schwim-

mer only recanted two specific items of his trial testimony. In particular, Schwimmer recanted his testimony that he overheard the statement "job well done," and that he heard a conversation in which Abraham Weiser stated that he was going to lock up the third floor.

The Court finds that Israel Schwimmer's recantation of these two items of evidence would have little impact on the totality of the evidence that was presented on the arson counts. Other more credible evidence established both of these items with greater detail at the trial. The Court recalls that at the trial Israel Schwimmer's entire testimony was short, restrained, vague, undetailed and could be viewed as somewhat unpersuasive. In contrast, more detailed and compelling evidence was presented that corroborated these two items. Victor Schlesinger testified at length about the circumstances, the declarant, and the tone of the statement "job well done." There was also evidence that regardless of whether Abraham Weiser stated he was going to lock up the third floor, the firefighters found that the third floor was locked the night of the fire along with the exterior entrances of the building, and that only the defendant and his brother had keys to the entire building. Even if the jury were to reject Israel Schwimmer's testimony as to these two items, other more credible evidence existed to sustain the verdict of guilty on the arson counts. Accordingly, the Court finds at the outset that the recanted evidence is insufficient to disturb the outcome of the trial.

Notably, Schwimmer did not recant with regard to other key evidence that he testified to at the trial. Indeed, during the interview Schwimmer reaffirmed portions of his trial testimony with even greater specificity than he had previously. At the trial, consistent with his restrained and somewhat evasive testimony, Schwimmer

provided little details about observing, on the day of or a day prior to the fire, the defendant and his son David Schlesinger removing about four or five bags of papers from the defendant's file cabinets. However, in the interview with Soshnick, Schwimmer confidently states several times that not only did he see Nat Schlesinger removing papers from the building prior to the fire, but that he called his wife and she observed it as well.

## 2. The Repudiation of the Recantation

On April 21, 2006, Israel Schwimmer testified at the evidentiary hearing, and essentially repudiated his recantation. A recantation that is repudiated is not only factually significant, but under the law, the character of the alleged "new evidence" undergoes a critical change. A recantation by a material witness is necessary to establish the first prong of the *DiPaolo* test, that is, "the falsity of the trial testimony." *Id.* at 50. If ultimately successful, the recantation stands as substantive evidence that may be used at the defendant's new trial if one is granted. *See id.*

 On the other hand, a repudiated recantation, such as is present in this case, is not useful in establishing the falsity of the trial testimony. Rather, the repudiated recantation merely suggests that the witness is "completely irresponsible...." *See* Moore's Federal Practice—Criminal Procedure § 633.05 (2006); *see also United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir.1988) (stating that a retracted recantation can hardly be considered "new evidence"); *Lespier*, 2006 WL 533792 at *7. Indeed, witness recantations are looked upon with such suspicion that the mere "failure of a defendant to produce or explain the absence of an affidavit of a recanting witness may be sufficient grounds for denying a motion for a new trial."

*DiPaolo,* 835 F.2d at 50 (quoting *United States v. Ward,* 544 F.2d 975, 976 n. 2 (8th Cir.1976)).

■ The recantation, once it is repudiated, is no longer substantive evidence that may be used at a new trial, but can only be used as impeachment evidence for the purpose of cross-examining the witness. *United States v. Glantz,* 884 F.2d 1483, 1486 (1st Cir.1989) ("A repudiated recantation is not substantial evidence, and can be used at a new trial only to cross-examine the witness."); *Lindsey v. United States,* 368 F.2d 633, 636 (9th Cir.1967); *Lespier,* 2006 WL 533792 at *7; *see also* Charles A. Wright, Nancy J. King, Susan Klein & Sara N. Welling, Fed. Prac. & Proc.Crim.3d § 557.1 (2006). Impeachment evidence that bears only on credibility is generally not a sufficient basis for obtaining a new trial. *See United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995) (citing *Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956) and *Spencer,* 4 F.3d at 119).

Although, at the evidentiary hearing, most of Schwimmer's testimony on cross examination was evasive, unforthcoming, and unenthusiastic, two key themes in his testimony were consistently confident, contrite, and said with conviction. First, Schwimmer testified several times that at the end of the interview with Soshnick he was given an affidavit to sign, and he refused to sign it because it was not the truth. Hr'g Tr. at 290. Second, Schwimmer continually re-affirmed no less than ten times that he had provided truthful testimony during the trial of Nat Schlesinger. Hr'g Tr. at 61, 75, 80, 148, 164, 168, 171, 173, 217, 287 and 311. For example, Schwimmer firmly responded to defense counsel on several occasions that, "I never lied at the trial or in the grand jury." Hr'g Tr. at 146. In response to repeated accusations of falsifying his testimony,

Schwimmer replied, "I told you the truth before, that I never lied on the trial, so what do you want now?" Hr'g Tr. at 217.

### 3. As to the Alleged Falsity of the Schwimmer Trial Testimony

Even if Schwimmer did not repudiate his recantation, the taped interview is unpersuasive in establishing the first prong of the *DiPaolo* test, that is, the falsity of Schwimmer's prior testimony. "[T]raditionally the recantation of testimony given on trial is looked upon with the utmost suspicion." *Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988) (citations and quotations omitted). Disbelief of a recantation made outside of court is often a reasonable reaction. "[T]he formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate." *Mendiola v. Schomig,* 224 F.3d 589, 593 (7th Cir.2000). "Some witnesses fall prey to influences—perhaps the persuasive influence of a skilled advocate asking leading questions, perhaps the less wholesome influence of the defendant's friends." *Id.*

Schwimmer's recantation is fraught with all of these improper influences. The interview is filled with leading questions that suggested an answer. For example, in the following exchange counsel for the defendant is questioning Schwimmer about alleged promises of leniency from the government:

> Mike: Was that ever actually told to you, were you given a promise by the prosecutor that if you—(inaudible)—that with your testimony that neither you nor anybody of your family members would be prosecuted for anything?
>
> Israel: They didn't say it out, but—(Yiddish)—this was it.

Mike: What I'm hearing from you is that it was your understanding that if you testified against Nat, no harm would come to you or your family members.

Israel: They didn't say it out. This was behind their backs.

Mike: That's what I'm asking you, was there some type of unwritten—

Israel: To tell you the truth, no, no written, no written promise, no nothing, no written promise, no nothing.

Def. Ex. A to the Rule 33 Mtn at 9.

Soshnick even tried to use metaphors to coax Schwimmer into saying that he received unwritten promises from the government, when he asked:

"What we're trying to ascertain right now is whether the government used the carrot and stick approach. You told us that they used the stick approach to the extent that if you don't testify consistently with your Grand Jury testimony you're going to jail for perjury.... So now we want to know, did they go in the other direction and use the carrot and say, and of course if you do testify consistently with your Grand Jury testimony you stand to get millions of dollars?"

Def. Ex. A to the Rule 33 Mtn. at 75–76. Schwimmer responded in a confused tone, and then clarified, "They didn't tell me that, no, no, they didn't tell it from [sic] me because I didn't." Def. Ex. A to the Rule 33 Mtn. at 76.

In addition, the hostile community pressure further leads to the unreliability of the recantation. Schwimmer had realistic reasons to fabricate his recantation. A review of the recording indicates that he sounds nervous and obviously was under intense religious and community pressure. Indeed, Schwimmer used the word "pressure" many times during the interview. Schwimmer stated, "We can not [sic] mention a word of pressure. I have no pressure. I have pressure by law from the Torah. I'm not going to heaven and I'm not allowed to lie. I don't want to mention the word pressure." Def. Ex. A to the Rule 33 Mtn. at 54.

Schwimmer eluded to the intense community pressure that he has been confronted with after he testified at the trial. He stated that many Rabbis in the community do not want him to pray in their synagogues. He asked Soshnick to tell Nat that he should speak to his kids and have them stop telling the Rabbis in the community that he is working with the government. Schwimmer explained, "See a lot of synagogues, they don't want to see me." Def. Ex. A to the Rule 33 Mtn. at 84. Schwimmer also stated "Let me tell you something, [Nat]'s willing to kill my wife the way it is." Def. Ex. A to the Rule 33 Mtn. at 80.

At one point Schwimmer even tried to negotiate a general release from Nat Schlesinger for all civil litigation. In response, Soshnick told Schwimmer that in exchange for the recantation he would recommend to Nat Schlesinger that he not take any action against Schwimmer, but states "that it's up to Nat to decide what action if any he wants to take against you, what action if any he wants his children to take against you." Def. Ex. A to the Rule 33 Mtn. at 127.

Towards the end of the interview the participants apparently try to explain why Schwimmer came to the attorney's office that day. Dabrowsky suggested that Schwimmer "reached out to the community that you wanted to come here and talk through Abe." Def. Ex. A to the Rule 33 Mtn. at 115. Diluzio further suggested:

There was a meeting that took place. Present at the meeting were so and so. Here's how he came to the office.

He came to the office because he was troubled, because he was concerned, and

he expressed that concern to the people in the community. He was worried about what was going to happen to his immortal soul. He had very grave concerns.

He was aware that he had lied. He was aware he was pressured. He didn't know how to relieve himself of that. He spoke to Abe who said, Look [sic], the only way you can relieve yourself of that is to go to Nat's attorney.

Def. Ex. A to the Rule 33 Mtn. at 115–16.

The circumstances under which the interview was conducted contribute to the Court's view that the recantation was unworthy of belief. In the meeting, Schwimmer was closeted with two experienced criminal defense attorneys for the defendant, a private investigator for the defendant, and Abraham Lichtenstein, a close ally of the defendant. At some point, it even appeared that Schwimmer believed that he was attending a meeting with an independent attorney that may represent him at some time in the future. Almost half of the interview was conducted before Schwimmer first finds out that Soshnick is representing Nat Schlesinger. Once notified, Schwimmer's demeanor noticeably changes. Schwimmer states "I'm taking things even [sic] you're gonna take me or not gonna." In response, Soshnick explains "Well let me say this to you, so that it's clear. Our client is, is Nat. And we're interested in, in trying to see if we can help Nat, because he's sitting in jail right now." Def. Ex. A to the Rule 33 Mtn. at 40–41. Schwimmer immediately reacts with surprise, stating, "So you are, you are a lawyer for Nat now." Def. Ex. A to the Rule 33 Mtn. at 40–41. Still unclear about the reason he was being interviewed by Soshnick, Schwimmer states later in the interview "you gonna [sic] be like my counsel . . . [b]ut it is a problem because you're the counsel for Nat." Def. Ex. A to the

Rule 33 Mtn. at 79. Soshnick clarifies, "Neither Adrian nor I represent you. Neither Adrian nor I can represent you because we're representing Nat in regard to the preparation of this Rule 33 motion." Def. Ex. A to the Rule 33 Mtn. at 84–85.

Even though Soshnick informed Schwimmer that he could not represent him, he proceeded to advise him that perjury carries a base offense level of 12 and that his prior criminal history is a category I under the United States Sentencing Guidelines. Def. Ex. A to the Rule 33 Mtn. at 108, 121. Soshnick concludes, "that puts you in a sentencing range of 10 to 16 months . . . ," but if Schwimmer were to plead guilty, "you're looking at 6 to 12 months." Def. Ex. A to the Rule 33 Mtn. at 122.

Abraham Lichtenstein also had a role in the interview. He is described by counsel for the defendant as Schwimmer's "confidant." It is apparent from the interview that Lichtenstein is not only aligned with Nat Schlesinger, but is also well-versed in the history of Nat Schlesinger and of his criminal case. Lichtenstein frequently speaks about the history of the Schlesinger family fight and about the case. At one point Schwimmer remarks about Lichtenstein's knowledge, "Yeah, yeah, yeah, yeah, yeah, yeah. He knows sometimes more better than me." Def. Ex. A to the Rule 33 Mtn. at 17–18. Lichtenstein later admits his knowledge, and perhaps refers to his alliance with Nat Schlesinger, stating, "I have little more knowledge of the case than these gentlemen have. I'm sure they looked into the case, but it's something *we* threw into their lap." Def. Ex. A to the Rule 33 Mtn. at 48 (emphasis added). When the interview turns to a discussion about Victor Schlesinger, Lichtenstein remarks "I'm gonna kill him." Finally, Lichtenstein, although not an attorney, demonstrates a knowledge of the

law by remarking that "a level 12 [under the guidelines] is 18 [months]." Def. Ex. A to the Rule 33 Mtn. at 108. Thus, the Court finds that Lichtenstein could not be viewed as Schwimmer's "confidant" or an unbiased disinterested witness in this case.

All of these one-sided influences in the interview must be viewed in the light of the turbulent atmosphere of community pressure depicted by the witnesses and the evidence submitted to the Court. It is clear that Schwimmer was under enormous pressure, from the community at large and at this meeting. The personal and pecuniary interest Schwimmer had against Schlesinger as a result of the ongoing family dispute is well supported by the evidence, and was advanced by the defendant at the trial. On the other hand, Schwimmer was under tremendous pressure to recant. Rabbis prohibited Schwimmer from praying at certain Synagogues and vicious fliers were distributed throughout the community denouncing and vilifying Schwimmer, proclaiming "May his name be erased." This Court cannot place credence in out of court statements made in such a hostile environment.

Scrutiny and skepticism of recantations is not only sensible, but it serves the dual purposes of protecting witnesses after the trial and promoting truthful testimony during the trial. By disbelieving recantations, when justified, judges protect witnesses such as Schwimmer, who, because of their testimony in court, have been subjected to scorn, fear, and intimidation. "Knowledge that obtaining a recantation will not affect the outcome of the trial makes it less likely that defendants and their friends will hound witnesses after trial." *Mendiola*, 224 F.3d at 593.

In sum, the recantation submitted by the defendant clearly did not satisfy the first or second requirement for granting a motion for a new trial under *DiPaolo*. The interview neither established the falsity of Schwimmer's trial testimony nor did it convince the Court that the jury would have reached a different verdict.

## C. As to the Alleged Perjury of Trial Witnesses

 The defendant also argues that both Schwimmer and Victor Schlesinger committed perjury at the trial. "Where the newly discovered evidence is the existence of allegedly perjured testimony, the defendant must first demonstrate that perjury was in fact committed." *United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997) (citing *United States v. White*, 972 F.2d 16, 20 (2d Cir.1992)); *United States v. Moore*, 54 F.3d 92, 99 (2d Cir.1995). A witness commits perjury by willfully giving false testimony concerning a material matter. *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). Perjury is not demonstrated by showing that testimony of a witness is inconsistent with the statements of another witness. *See Gallego*, 191 F.3d at 162; *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir.1995). Incorrect testimony resulting from confusion, mistake, or faulty memory, or simple inaccuracies or inconsistencies in testimony likewise do not rise to the level of perjury. *See Monteleone*, 257 F.3d at 219; *Sanchez*, 969 F.2d at 1414–15.

 However, once perjury is demonstrated, a new trial is not automatic. "Rather, when a trial has been tainted by false testimony, th[e][c]ourt is 'called upon to strike a fair balance between the need for both integrity and finality in criminal prosecutions' by determining whether false testimony was prejudicial in the sense that it affected the outcome of the trial." *Stewart*, 433 F.3d at 297 (quoting *Stofsky*, 527

F.2d at 239). In undertaking such review, the court looks at the materiality of the perjury to the verdict and applies one of two well-settled standards that focus on the "extent of the government's awareness of the false testimony prior to the conclusion of the trial." *Id.* (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

"Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wallach*, 935 F.2d at 457. Indeed, the knowing introduction of false testimony by the government will lead to "virtually automatic" reversal. *Stewart*, 433 F.3d at 297 (quoting *Wallach*, 935 F.2d at 457). This relaxed standard "serves the dual purposes of discouraging prosecutorial misconduct and providing relief from an unfair conviction." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see also Perkins v. Le Fevre*, 691 F.2d 616, 619 (2d Cir.1982).

On the other hand, where the government has no knowledge or is unaware of the perjury, "a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Wallach*, 935 F.2d at 457; *see also Stewart*, 433 F.3d at 297; *Monteleone*, 257 F.3d at 219.

The defendant argues that this Court should follow the reasoning in *Ortega v. Duncan*, 333 F.3d 102 (2d Cir.2003), and grant a new trial if it can be shown that a witness is a "demonstrated perjurer." Not only does this argument misconstrue the holding of *Ortega*, but the mere showing that a witness is a "demonstrated

perjurer" is not and has never been the standard in the Second Circuit on a motion for a new trial. Indeed, the rule that "[p]erjury in and of itself is insufficient to justify relief under Rule 33 ..." was recently affirmed in *Stewart*, 433 F.3d at 297, and has been well-established since *Wallach*. 935 F.2d at 457; *see also White*, 972 F.2d at 22 ("[T]he mere fact that [the witness] lied on the witness stand does not automatically entitle [defendant] to a new trial.").

This Court agrees, and is bound, by the holding in *Ortega*, that "a determination that [a witness's] recantation [is] not credible is insufficient to establish that [the witness's] trial testimony was not perjured.... Rather, the court must weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching this conclusion." *Ortega*, 333 F.3d at 107. Accordingly, this Court has analyzed the additional evidence of perjury that the defendant submitted with the motion and during the evidentiary hearing, and finds it to be plainly insufficient to demonstrate perjury.

The additional evidence presented by the defendant in this case is very different from the type of additional evidence in *Ortega*. Also, in *Ortega* the witness reaffirmed his recantation at the evidentiary hearing on the motion for new trial. *Id.* at 105. The additional evidence proffered in support of the recantation was not hearsay, but admissible evidence that substantiated the recantation. This evidence included a statement from the mother of the witness, who the witness had testified he was with when he observed the crime, that she was not at the crime scene. *Id.* Further, the defendant offered a recantation from the second, and only other, corroborating witness to the crime. *Id.* at 107. Most notably, the defendant showed that

the witness had recanted his testimony in two prior unrelated cases.

The additional evidence of perjury in the instant motion for a new trial pales in comparison to the evidence presented in *Ortega*. In this motion the defendant offers a multitude of out-of-court statements from members of the Williamsburg community, and the testimony of Susan Necheles, all of which claim that prior to or after the trial Schwimmer admitted to them that he and Victor Schlesinger lied at the trial due to a family dispute. In addition, the defendant argues that Schwimmer's incredible responses during cross-examination at the evidentiary hearing demonstrate his willingness and capacity to lie under oath.

The defendant argues that this newly discovered evidence shows that Schwimmer acknowledged conspiring with Victor Schlesinger to provide false testimony. The defendant does not assert that the government knew or should have known about the alleged conspiracy. As such the Court could only find that a new trial is warranted "if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Wallach*, 935 F.2d at 457; *see also Stewart*, 433 F.3d at 297; *Monteleone*, 257 F.3d at 219.

As the defendant "frankly" admits, "the contents of the statements of these community members would not alone suffice to establish the perjury of Schwimmer and [Victor] Schlesinger in any case." Def. Mem. of Law in Supp. of Rule 33 Mtn. at 6. Rather, the defendant contends that they strongly support the veracity of Schwimmer's recantation and his statements concerning the fabrication of testimony by Victor Schlesinger. The Court disagrees.

First, a number of the out-of-court statements provided to the Court, such as the statement of David Ganz about a conversation occurring near the 2005 Passover, detail hearsay conversations that the affiants or declarants had with Israel Schwimmer prior to or during the defendant's trial. As such, this evidence is not "newly discovered" and does not meet the threshold requirements of this motion for a new trial.

As to the statements that occurred after the trial, such as the admission to Necheles, these hearsay statements largely detail Schwimmer's motivation for testifying at the trial, that is, the bitter family feud between the family of Jack Schlesinger and the defendant, a fact thoroughly explored and argued by the defendant at trial, and ultimately apparently rejected by the jury. Evidence of this nature that is merely cumulative or impeaching is not an adequate basis for the grant of a new trial. *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir.1999).

The parts of the hearsay statements that include assertions that Schwimmer or Victor told them they "lied at the trial," are insufficient to establish that Schwimmer or Victor willfully falsified their trial testimony. These hearsay statements can either be viewed as (1) questionable hearsay evidence of perjury; (2) additional evidence of Schwimmer's unsworn recantation; or (3) inadmissible extrinsic impeachment evidence of Schwimmer's repudiation of his recantation. All of the statements suffer from the same evidentiary infirmity; they were not made under oath. Instead, they were all made in the aura of tremendous community pressure, and outside "the formality of a court, the presence of the litigants, and the gaze of a judge [that] induce witnesses to hew more closely to the truth...." *Mendiola*, 224 F.3d at

593. In striking contrast, Schwimmer repudiated all of his statements of recantation at the hearing while he was under oath and in an open court.

Indeed, one hearsay statement advanced by the defendant is particularly unreliable. The defendant argues that the context of the statements Schwimmer made to attorney Necheles is highly indicative of their reliability because he was speaking to an attorney for the purpose of obtaining "advice and guidance." However, as the defendant argued during the evidentiary hearing in support of admitting Necheles' testimony, in the face of the obvious privilege barrier, the communications were not "made in confidence" because individuals other than the attorney and client were present. See *Denney v. Jenkens & Gilchrist*, 362 F.Supp.2d 407, 412 (S.D.N.Y. 2004) ("It is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship"); 8 Wigmore, Evidence § 2311 ("One of the circumstances by which it is commonly apparent that the communication is not confidential is the presence of a third person who is not the agent of either client or attorney").

Here, not only were there other individuals present, which led to a waiver of the privilege, but the circumstances of the meeting with Necheles raise concerns about reliability. Prior to meeting with Schwimmer, Necheles was confronted by Schwimmer's wife who alerted her that she should not meet with her husband because he had been kidnaped. When Necheles eventually did meet with Schwimmer he was brought to her personal residence by "two or three other men ... all named Schwimmer." Although Necheles inquired whether Schwimmer was there of his own free will, she could not even identify who the other individuals were or why they needed to be present during her important first meeting with her new client.

Putting the unusual circumstances aside, Necheles' testimony substantiated the tremendous community pressure that Schwimmer was under, possibly pushing him to give an untruthful recantation even to her. Necheles testified that Schwimmer told her he was prompted to recant by a desire to clear his conscience and make amends for testifying against another Jew, consistent with the principles of "Maseera" proclaimed by the religious court Beis Din Tzedek. Necheles further explained the definition of the term "mooser," a label that was branded on Schwimmer by certain members of the community. She stated that a "mooser" is somebody who goes to civil authorities and tells about another Jew in the community. With reasonable certainty, this form of community ostracizing that Schwimmer was subjected to is one of those out-of-court influences that could regrettably lead a witness to give a false recantation.

The Court also finds that any alleged perjury was not material to the verdict rendered. As detailed above, independent evidence supported the defendant's conviction on the arson counts. Significantly, the jury was well-aware at the trial of the bitter family dispute and of the allegations that Victor Schlesinger and Israel Schwimmer fabricated their testimony. Indeed, during the trial the defendant recalled Abraham Weiser to the stand and he stated that he was approached by some of the government witnesses who testified at the trial and that they told him they were lying on the stand "to fix Nat." Trial Tr. at 2451, 2458. The jury heard and apparently rejected this argument. Any additional "new" evidence of the fabrication would be not only be cumulative impeachment, but also immaterial. In other words, if the

jurors had this additional hearsay impeachment evidence alleging that Schwimmer and Victor Schlesinger had lied under oath about the statements they overheard, with reasonable certainty, the verdict probably would not have been different.

Finally, the defendant argues that the newly discovered evidence about Victor Schlesinger's involvement in the Foodland Minnesota fraud would have materially affected the jury verdict on the arson counts. This argument is clearly without merit. Impeachment evidence that bears only on credibility is generally not a sufficient basis for obtaining a new trial. *See Reyes,* 49 F.3d at 68 (citing *Mesarosh,* 352 U.S. at 9, 77 S.Ct. 1, 1 L.Ed.2d 1). Although the defendant offered evidence to show that Victor Schlesinger was most likely involved in the Minnesota fraud, this would constitute cumulative impeachment material because the attorney for the defendant cross-examined Victor Schlesinger about whether he was ever involved in a business in Minnesota. *Diaz,* 176 F.3d at 108; *Locascio,* 6 F.3d 924, 949–50 (2d Cir.1993) (affirming denial of a new-trial motion where newly discovered evidence would merely have been cumulative impeachment material against a witness' credibility). In addition, it is questionable whether Victor's involvement in an alleged fraudulent loan in Minnesota was sufficient to show that his responses at the trial constituted perjury. *See United States v. Petrillo* 237 F.3d 119, 124 (2d Cir.2000), *abrogated on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177(2004) (holding that "misleading rather than demonstrably false" testimony is not perjury).

**D. As to The Government's Alleged Failure to Disclosure Impeachment Evidence**

The Constitution requires the government to disclose to the defendant any information in their possession that is both favorable and material to his guilt or sentence. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This obligation includes information useful solely for impeaching the credibility of a government witness. *Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, while the government is required to disclose material exculpatory evidence, it is not required to disclose evidence that the defendant has sufficient access to or knowledge of to permit him to take advantage of the exculpatory evidence. *See United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993) (citing *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982)).

The Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also Youngblood v. West Virginia,* — U.S. —, —, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269, — (2006). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (citations omitted). Thus, a prosecutor is only obliged to disclose "any information held by those whose actions can be fairly imputed to

him—those variously referred to as an 'arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Bin Laden,* 397 F.Supp.2d 465, 481 (S.D.N.Y. 2005); *see e.g., United States v. Zagari,* 111 F.3d 307, 320 n. 13 (2d Cir.1997); *United States v. Chalmers,* 410 F.Supp.2d 278, 288–90 (S.D.N.Y.2006).

▮ In the defendant's motion, he claims that the government failed to disclose information concerning an investigation commenced in 2002 by the Chicago office of the Small Business Administration concerning an alleged fraudulent loan obtained by Foodland Industries, which was allegedly co-owned by Victor Schlesinger. The investigation ended in June 2004. After an investigation, the United States Attorney's office for the District of Minnesota formally declined to prosecute.

After conducting an evidentiary hearing at which numerous government agents involved in the Minnesota investigation testified, the defendant failed to demonstrate that any of the investigators or prosecutors in the instant case had access to or knowledge of any undisclosed impeachment material concerning Victor Schlesinger. Indeed, the evidence adduced at the hearing showed that it was the defendant's son Sam Schlesinger who prompted the SBA to open an investigation into Gary Schlesinger's business activities in Minnesota. Accordingly, the Court finds that government had no knowledge, actual or imputed, of the Minnesota investigation.

Finally, the evidence shows that the defendant had sufficient knowledge of the Minnesota investigation prior to the trial. Victor Schlesinger was cross-examined at the trial by the defendant's counsel about whether he had any business activities in Minnesota. "Where the challenged false testimony was elicited by the defense, rather than the prosecution, that circumstance tends to establish the government's unawareness of the perjury." *United States v. Damblu,* 134 F.3d 490, 493 (2d Cir.1998) (citing *United States v. Wong,* 78 F.3d 73, 81–82 (2d Cir.1996)). Here, all the evidence indicates that the defendant had knowledge of the alleged impeachment evidence prior to the trial. Accordingly, the Court finds that the government did not improperly suppress the subject information in violation of *Brady* or *Giglio.*

## III. CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED**, that the defendant's motion for a new trial is DENIED in all respects.

**SO ORDERED.**